# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# LAFAYETTE DIVISION

| | | |
|---|---|---|
| CHRISTELLA LOVATO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-84-PPS |
| | ) | |
| WAL-MART STORES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

This is a lawsuit alleging sex discrimination and retaliation in employment by defendant Wal-Mart Stores, Inc. Plaintiff Christella Lovato was a pharmacy student and while she was pursuing her degree worked as a "Pre-Grad Pharmacy Intern" at a Walmart in Lafayette, Indiana. Lovato alleges that after she broke off a short-lived relationship with another pharmacy intern, her life at Walmart became a living hell. She alleges she was sexually harassed by her former paramour and that Walmart did nothing to stop it, generally turning a blind eye. She says that she was unfairly treated by management who favored him over her in matters of scheduling, and when she complained, management told her she was "full of drama." Then when she sought legal protection against her harasser, she says that her superiors retaliated against her by offering her a Hobson's choice: take a transfer to a distant store or be fired. When she refused the transfer, Walmart made good on its promise and sacked her.

Unsurprisingly, Walmart sees things differently. As such, and now that discovery has closed, it has moved for summary judgment on all of Lovato's claims. As discussed below, while I agree with Walmart in several respects, their effort to win this lawsuit without having a jury decide key factual issues cannot succeed in full. There is simply too much conflicting testimony and controverted evidence which, when viewed in the light most favorable to Ms. Lovato, cannot be resolved without a jury. Accordingly, I will grant in part and deny in part Walmart's Motion for Summary Judgment.

## Background

Let's start, as usual, with the facts, recounted in the light most favorable to Lovato, the non-moving party. In October 2012, Lovato was enrolled as a pharmacy student at Purdue University in West Lafayette, Indiana. At that time, she began working at a Walmart store in Lafayette Indiana as a "Pre Grad Pharmacy Intern." The following February, Lovato had a baby, which reduced her availability to work to some extent. She continued working as a pharmacy intern for approximately two years without any apparent incident or difficulty in scheduling around Lovato's school schedule (which all such pharmacy interns had) and her specific childcare needs. [*See* Jenkins Dep. at 46-47, 94-97.]

In July 2014, Lovato briefly dated and had a consensual sexual relationship with a co-worker named Matthew Westenfeld who, like Lovato, was a pharmacy student at Purdue. [Westenfeld Dep. at 8-9, 24-26, 46.] According to Lovato, the relationship ended

the same month it began because she felt that Westenfeld was only interested in sex. Shortly thereafter, Lovato experienced symptoms she thought were a sexually transmitted infection and she texted Westenfeld that he should be tested. Lovato says she thought Westenfeld had given her an STI. Westenfeld denied having an STI and told Lovato as much. [Lovato Dep. at 141-43, 147.] In truth, neither gave the other any infection, but that wasn't the end of the matter.

In August 2014, another Walmart employee complained to management about Lovato, Westenfeld and another intern, who were all discussing sex while on the job. An investigation ensued, but no employees were transferred or disciplined. Lovato and Westenfeld continued to work together for several months, seemingly without issue, but by February 2015, the relationship deteriorated even further.

In February 2015, Lovato and Westenfeld exchanged a series of text messages. Westenfeld testified that what precipitated the text messages was him getting an STI test (which came back negative) after another pharmacy student told him that Lovato had been telling people he gave her an STI. The two traded juvenile barbs over text, accusing one another of various indiscretions, each saying the other was harassing them, and calling one another "trash." Neither party comes out looking particularly good in the exchange. At one point, Westenfeld told Lovato that she was "nothing but drama and everyone knows it." [DE 60-1 (Sealed) at 166-171.] Two days later, Lovato filed a harassment complaint against Westenfeld with their university. The school sent Westenfeld a letter telling him that for everyone's safety, he should have no contact

with Lovato while the complaint was under investigation. [*Id.* at 162-163.] Lovato also brought the complaint and letter to Walmart's attention.

After receiving the information from Lovato, Walmart's Pharmacy Manager Deb Jenkins initiated an investigation into the matter. [Lovato Dep. at 202-204.] Jenkins learned the text messages occurred outside of work and that they were the result of the pair's prior sexual relationship which had ended months before. Both Lovato and Westenfeld requested that they not be scheduled to work at the same time in their store's pharmacy. Since both were in school still and working part time, Jenkins (who was responsible for scheduling the pharmacy interns) was able to arrange their schedules so that they did not overlap. [*See* Jenkins Dep. at 27-36.]

When the school year ended, both Lovato and Westenfeld requested to work full time. Lovato indicated that while she wanted to work 40 hours a week, her continuing childcare needs made it so that she could not be scheduled to work nights or weekends. She also reiterated that she could not work overlapping shifts with Westenfeld. According to Walmart, this presented a scheduling puzzle which could not be solved; there were simply not enough hours during the week that the pharmacy was open so that both Westenfeld and Lovato could work 40 hours a week without any overlap unless Lovato worked nights or weekends. But Jenkins, sympathetic to each intern's desire to work full time, called around to other area stores and was able to place Lovato in various open shifts at those stores, at least for the time being. But in Lovato's view, Jenkins was favoring Westenfeld, allowing him to work full time at a single store, while

Lovato was having to work at multiple stores to have full time work. [Lovato Dep. at 191:8-24.]

When the hodgepodge scheduling efforts proved unworkable, Jenkins ran the issue up the command chain at Walmart and discussed the issue with Market Health and Wellness Director Kari Preston. Lovato says this occurred only after she told Jenkins how unfair the current arrangement was to her. In any event, after conferring with Robin Landrum, a Human Resources Manager at Walmart, Preston told Jenkins that Lovato and Westenfeld would need to be scheduled together and that Jenkins should stop scheduling Lovato to work at other stores in greater Lafayette area. On April 30, 2015, Preston met with Lovato personally to discuss the issue. She told Lovato that she needed to expand her availability if she wanted to pursue a career as a Walmart pharmacist. Lovato also says that Preston asked her why she was causing so many problems. Lovato explained her history with Westenfeld, the text message exchanges from February 2015, and the "no contact letter" Purdue had sent Westenfeld. She also requested a transfer to another store in the area. Preston told her she would investigate the matter but that in the meantime Lovato should work on expanding her availability. [*See* Preston Aff. at ¶¶ 6-12.]

Several weeks later, Preston, Jenkins and Lovato had another meeting to discuss the situation. During this conversation, Lovato reiterated her scheduling limitations, both because of her childcare needs and her desire not to work alongside Westenfeld. The three also discussed the no contact letter. Preston explained to Lovato that she

could not be scheduled full time given these limitations and Lovato was given a choice between continuing full time and working evenings and weekends and overlapping with Westenfeld or not working full time. Lovato states, without citation to record evidence, that the choice was made under threat of termination and thus under duress. Lovato explained that she wanted to work full time and thus she would seek childcare and work overlapping shifts with Westenfeld. [*Id.* at ¶ 7.] Jenkins further offered to have her own mother assist by babysitting Lovato's child when possible. Jenkins then met with Westenfeld and informed him that he and Lovato would be working some overlapping shifts. [Jenkins Dep. at 40-41.]

After this meeting, but before the new schedule took effect, Lovato also reached out to Robin Landrum, the human resources manager, to explain the situation and ask about the possibility of transferring stores. Lovato also states that Preston testified that the assignment and number of pharmacy interns at individual stores is within Preston's discretion and that budget concerns were not at issue when placing pharmacy interns. Effectively, Lovato says that Preston had full authority, if she wanted, to place Lovato in the store Lovato wished to be transferred to (which was within the Lafayette-area near where Lovato attended school at Purdue in West Lafayette). [Preston Dep. at 62-63.] But at this time, Lovato was not offered to transfer to another store in the Lafayette-area.

Beginning in June 2015 and into early July 2015, Lovato's new schedule took effect. She worked 11 overlapping shifts with Westenfeld over approximately three weeks. When Westenfeld and Lovato had overlapping shifts, Lovato testified that

Westenfeld took the opportunity to harass her and make working with him unbearable. She says that during these shifts he touched and groped her buttocks multiple times as he passed by her in the pharmacy. Lovato testified that she felt these actions were meant to harass an intimidate her. She also testified that he would slam pill bottles on counters which made her feel threatened. She further testified that while she was working at her computer (signed in via her credentials), Westenfeld would come up to her, push her aside and access the computer using Lovato's credentials (in violation of Walmart policy). These shifts all occurred after Lovato had obtained her "no contact" letter from Purdue, shown it to her supervisors, and specifically complained to them about Westenfeld. [Lovato Dep. at 192-93, 222-23.] Westenfeld denies the allegations of groping Lovato's buttocks and testified that he only used the computer while logged in with her credentials because of an unspecified "urgent issue" involving a customer.

On June 19, 2015, Lovato brought these allegations to the human resources manager Robin Landrum. Landrum investigated but with no witnesses or video footage and Westenfeld's denial, Landrum could not corroborate Lovato's version of the events. A few days later, during another overlapping shift, Lovato and other employees in the pharmacy department observed Westenfeld and another employee aggressively flirting with one another, messaging one another, and "getting handsy." [Lovato Dep. at 231.] Eventually another co-worker told them to cut it out, but Westenfeld apparently continued to behave "aggressively." [*Id.*] Lovato testified that after this incident, she

thought things would not change and she decided to take legal action against Westenfeld and seek an *ex parte* order of protection against him.

Lovato obtained the order of protection on July 7, 2015. The following day she emailed Landrum informing her of the order and that she did not want to work with Westenfeld again. Landrum informed Preston and Jenkins of the order of protection and that Westenfeld and Lovato should not be scheduled to work any longer in compliance with the court's order.

Around this time, and based on a lead from Landrum, Lovato applied for a pharmacy job at Sam's Club (a subsidiary of Walmart). Lovato interviewed but did not get the job with Sam's Club. After she did not get the job at Sam's Club, on August 10, 2019, Lovato was given the option to transfer to another store. But not to the other store in the Lafayette area that she had previously requested. Instead, she was offered a position at a Walmart in Frankfort, Indiana, approximately 25 miles from where she had been working. [Preston Aff. at ¶¶ 12-16.] Preston testified that the Frankfort store was in most need of an intern and that is why Lovato was offered a spot only there. [*Id.*] The Lafayette-area stores apparently had between six and eight interns at this time, but the Frankfort store only had two. After approximately two weeks consideration (Lovato was with her family in New Mexico at this time), Lovato declined Preston's offer. When Lovato declined the invitation to be transferred to the store in Frankfort, Indiana, Walmart terminated her employment with the company. This suit followed.

**Discussion**

Before getting to the main analysis of Lovato's claims and the associated evidence, I must first address three ancillary motions filed by Walmart. Walmart filed its opening and reply briefs provisionally under seal and has moved for leave to keep them that way. [DE 54, 66.] Lovato does not oppose these motions, and because they contain confidential health information relating to Lovato and third parties, I will maintain the portions of Walmart's briefs which were redacted under seal. And while the Court has considered all of the facts provided by the parties, including those which required Walmart's filings to be under seal, this opinion will not discuss those facts in detail because, while they are germane and provide necessary background, none are material facts for purposes of rendering a decision on the merits. This likewise avoids the need to maintain this opinion under partial seal.

In addition, Walmart has filed a Motion to Strike Lovato's opposition to Walmart's motion for summary judgment to the extent it is styled as a "Cross-Motion" for summary judgment. [DE 65.] The dispositive motion deadline was January 4, 2019, and Lovato's "cross-motion" was filed well after that date. This case was not assigned to me when the scheduling order was entered in this case, but I will nevertheless respect the deadlines imposed by the judges previously handling this matter. It's clear Lovato did not timely file her cross-motion for summary judgment. Other courts in the Seventh Circuit have refused to consider late summary judgment motions which were filed after the deadline as "cross-motions." *E.g.*, *Kimberly Clark Worldwide Inc. v. First*

*Quality Baby Prod. LLC*, 2012 WL 1413299, at *1 (E.D. Wis. Apr. 23, 2012); *Patton v. MFS/Sun Life Finiancial Distributors, Inc.*, 2005 WL 6115328, at *1 (S.D. Ind. Nov. 8, 2005). In any event, as discussed below, the claim on which Lovato seeks summary judgment is fatally flawed, and as a result, must be decided in Walmart's favor. Accordingly, I will deny Walmart's Motion to Strike. [DE 65.]

Federal Rule of Civil Procedure 56 governs a motion for summary judgment. Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party can either point to undisputed facts supported by evidence or point to an absence of evidence as to some element of the other party's claim or affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Because this case is before me on Walmart's motion for summary judgment, I must view all facts in the light most favorable to Lovato. I must review the evidence presented and construe all facts and draw all inferences from those facts "in the light most favorable to the non-moving party." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649 (7th Cir. 2014). In order for the non-moving party to prevail, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat.*

*Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). Summary judgment should be denied "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

### A. Lovato's Claim of Sexual Harassment and Hostile Work Environment

Count I of Lovato's complaint alleges that Walmart is liable to her for Westenfeld's alleged sexual harassment which created a hostile work environment. Sexual harassment claims against employers are not easy to prove. "A sexual harassment claim under Title VII requires [Lovato] show: (1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018). Walmart says that because Lovato cannot establish a question of fact as to the second, third, or fourth elements, her claim fails. I agree that Lovato fails the third or "severe or pervasive" prong.

I begin my analysis by noting that "[a]lthough one might think that any nonconsensual sexual touching could give rise to a claim", the Seventh Circuit has rejected any such bright-line approach and instead requires an assessment of the case based on the totality and particularities of each case. *See Everson v. City of Madison*, 672 F. Supp.2d 881, 884 (W.D. Wis. 2009). Indeed, the Seventh Circuit has held in multiple

instances that incidents of touching, including of the buttocks, without more, will not constitute severe sexual harassment. *E.g.*, *Hilt–Dyson v. City of Chicago,* 282 F.3d 456, 463–64 (7th Cir. 2002) (two instances of back rubbing not sufficiently severe); *Adusumilli v. City of Chicago,* 164 F.3d 353, 361–62 (7th Cir. 1998) (holding that "four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" not sufficiently severe or pervasive to survive summary judgment); *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 706–08 (7th Cir. 1995) (holding that physical contact of supervisor rubbing his foot against a plaintiff's leg and grabbing her buttocks a single time insufficient to survive summary judgment); *Saxton v. AT &T,* 10 F.3d 526, 528 (7th Cir. 1993) (running hand along plaintiff's upper thigh and kissing her not sufficient). By contrast, in cases in which the touching was more invasive, explicitly sexual in nature, and coupled with verbal sexual harassment, courts have found these actions severe. *E.g.*, *Patton v. Keystone RV Co.,* 455 F.3d 812, 816–17 (7th Cir. 2006) (allegation that harasser's "hand was under [plaintiff's] shorts, on her inner thigh, and touching her underwear" was severe); *Worth v. Tyer,* 276 F.3d 249, 268 (7th Cir. 2001)(touching of plaintiff's "breast near the nipple for several seconds is severe enough"); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 807–09 (7th Cir. 2000) (nonconsensual kissing and attempts to remove bra sufficiently severe to survive summary judgment); *Doe v. City of Belleville,* 119 F.3d 563, 582 (7th Cir. 1997) (finding repeated comments and threats concerning forcible anal sex, being called "queer" and "fag," and the nonconsensual grabbing of a teenager's testicles to be severe and pervasive) (vacated on other grounds

by *City of Belleville v. Doe*, 523 U.S. 1001 (1998)). Unfortunately for Lovato, while I find her description of Westenfeld's conduct troubling and inappropriate for the workplace, even if I credit everything she says occurred, the mandate of the Seventh Circuit is clear.

The alleged workplace harassment occurred over a period of a few weeks when Westenfeld and Lovato worked 11 overlapping shifts. Prior to that, the two worked together for a long time without incident, and then did not work together for several months after their heated text message exchange and Lovato obtained the no contact letter from their university. Lovato testified that Westenfeld touched her buttocks as he passed by her in the pharmacy. But as noted above, the Seventh Circuit has held in multiple instances that touching of that nature, without more, is not enough to survive summary judgment. *E.g.*, *Adusumilli*, 164 F.3d at 361–62; *Koelsch*, 46 F.3d at 706–08. Nor are vague assertions of inappropriate flirting between Westenfeld and another associate sufficient for Lovato's claim of sexual harassment, as there is no indication those were directed at Lovato or designed to harass her. Finally, the use of her computer and slamming of pill bottles appear to bear little to no relation to Lovato's sex or gender and thus add little weight to the claims of sexual harassment. Title VII does not protect against unpleasant work environments, but instead those which become hostile based upon pervasive sexual harassment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (noting that Title VII is not "a general civility code for the American workplace").

As such, Lovato's citation to cases such as *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422 (7th Cir. 2012) are inapposite. In that case, in which the Seventh Circuit was affirming a jury verdict as opposed to reviewing a decision on summary judgment, the teenaged plaintiff testified that the harasser "engaged in sexually harassing conduct during ***every*** shift" and that he was her assistant manager, *i.e.* her supervisor. *Id.* at 432 (emphasis added). And in addition to "slap groping" the plaintiff's buttocks, the assistant manager made repeated lewd comments: "[h]e told her he wanted to 'fuck her,' propositioned her for three-way sex with his girlfriend, told her she was 'kinky' and liked 'rough' sex, and stared at the intimate parts of her body 'like a piece of meat.'" *Id.* There is simply no such similar evidence presented in the record in this case. Westenfeld was not Lovato's superior and made no such similar statements. The other case Lovato cites to where the environment was held to be potentially severe and pervasive enough to survive summary judgment also differed not in degree but in kind from hers. *See Hostetler*, 218 F.3d at 807–08 ("Having a co-worker insert his tongue into one's mouth without invitation and having one's brassiere nearly removed is not conduct that would be anticipated in the workplace, and certainly not in a family restaurant."). The conduct here, although inappropriate, was neither pervasive or severe enough to be actionable against Walmart.

Finally, I must address Lovato's argument that Walmart allowed a hostile work environment intentionally or negligently after it required her to work alongside Westenfeld in June 2015. The problem for Lovato is temporal in nature. There is no

record evidence that prior to June 2015, Westenfeld ever sexually harassed or came close to sexually harassing Lovato in the work place. The prior summer Lovato and Westenfeld had a consensual sexual relationship. For months thereafter, they worked together without incident. Then in February 2015, the heated text messages outside of work regarding STIs occurred. In response to those, Lovato filed a complaint with her university and obtained the no contact letter. But that does not mean his texts to her were sexual harassment. Westenfeld did not make sexually suggestive comments to her in these texts or threaten to physically assault her, sexually or otherwise. Instead, a review of the text messages makes clear that the two fought back and forth, accusing one another of being dramatic and trash because of their shared STI scare. And while the names used by Westenfeld for Lovato, including "nasty ass" and "fucking trash" are certainly crass, they are not sexual or gender-specific terms which would violate Title VII. *See Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996) (affirming dismissal of case where male co-worker called female co-worker a "sick bitch" repeatedly in the work place after their failed sexual relationship because the term is not inherently gendered). *Cf. Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) (finding use of "dumb fucking broads" and "fucking cunts" as being inherently gendered terms of sexual harassment). Thus, this exchange cannot be the basis for a sexual harassment claim and Walmart did not foster a hostile work environment when it required Westenfeld and Lovato to work overlapping shifts in the pharmacy.

Because Lovato fails to create a triable issue of material fact as to the severe or pervasive prong of a sexual harassment claim, I need not address Walmart's remaining arguments on this claim. Accordingly, I will grant Walmart's motion for summary judgment as to Count I.

### B. Lovato's Claim of Discrimination Based on Sex

Count II of Lovato's complaint alleges that Walmart discriminated against her in employment because of her gender; in other words, by firing her because she is a woman. "Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir. 2001) (citations and internal quotation marks omitted). As such, there are two key considerations: (1) was the divergent treatment prompted by the plaintiff's gender?; and (2) did that treatment adversely and materially affect the plaintiff's employment conditions? *Id.* Title VII does, however, protect more than only "explicit discriminations based 'solely' on sex." *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971). If an employer acts with mixed motives—one based on sex, the other not—that too is actionable. In other words:

> An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even

if the employer also had other, lawful motives that were causative in
the employer's decision.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

When determining issues of causation, I must look at all the evidence offered "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The task is a holistic evaluation of all of the evidence, not one of dividing it into distinct categories which may or may not support liability. *Id.* I must also use the burden-shifting standards which were created by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff who cannot offer up direct evidence of protected status-based discrimination must establish four things to make out a prima facie case: (1) that they belong to a protected class; (2) they met their employer's legitimate job expectations; (3) they suffered an adverse employment action; and (4) other employees who were similarly situated but not within the same protected class received more favorable treatment. *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 744 (7th Cir. 2002). The Seventh Circuit allows employees to satisfy these prongs in a variety of fashions. For example, where an employee offers evidence that the "legitimate expectations" were themselves pretextual, the employee need not show they met those expectations. *See Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1404 (7th Cir. 1996); *Brummett*, 284 F.3d at 745) ("To make a credible argument for merger in this case, Brummett has to show that the Herald's legitimate expectation of an employee's good-

driving record was instead a pretextual policy cloaked in the shadow of racial discrimination.").

Once an employee makes out that prima facie case, the burden shifts to the employer "to articulate a legitimate and non-discriminatory reason for the employee's termination." *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996). If the employer does this, the burden shifts back to the plaintiff to show that the proffered reasons were pretextual, *i.e.* a lie or "phony reason." *Id.* (citation omitted); *see also Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995) ("There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment.").

Here, Walmart says that Lovato cannot establish that she was meeting Walmart's legitimate expectations or that any similarly situated non-female employees received more favorable treatment. And Walmart says even if she could make a prima facie case, it had legitimate nondiscriminatory reasons to fire her. Specifically, it relies upon the fact that Lovato "refused to work evenings or weekends, rejected a transfer to the Frankfort store, and insisted upon working at the store that was closest to her home." [DE 56 at 20.]

First, I'll address the issue of meeting Walmart's legitimate employment expectations. There is no allegation and Walmart has not pointed to any evidence that Lovato could not handle the day-to-day responsibilities of a pharmacy intern or that she

had poor performance. Instead, it says that she did not meet its expectations concerning availability and hours and that she refused a transfer to the Frankfort store.

But Walmart points to no official policy mandating a set number of hours for pharmacy interns. In fact, the only evidence of any policy comes from Lovato when she notes that Preston testified that there was no particular threshold number of hours that a pharmacy intern was expected to be available to work. [Preston Deposition 90:7-11.] Preston likewise testified that school is the priority in terms of scheduling interns and family needs are likewise considered for scheduling purposes. [*Id.* at 91:7-11.] This is further evidenced by the fact that, for a long time, Walmart was able to schedule Lovato and accommodate her childcare needs without much issue. Furthermore, Lovato complied with Preston's instructions to "work on her availability" (*i.e.* obtain child care) and for a short time worked evening and weekend shifts. It was only when she obtained the restraining order which prohibited Lovato and Westenfeld from working simultaneously that scheduling apparently became impossible for Walmart.

What's more, the start of a new school year was approaching at the time of Lovato's termination, and presumably all interns would be going down to working part time again. But Walmart did not address the situation by waiting things out for a few more weeks and scheduling Westenfeld and Lovato part-time without overlap. Westenfeld was not asked to transfer. Westenfeld was not told he had to have his hours reduced to allow both he and Lovato to work over the summer. Instead, Walmart gave

Lovato, and only Lovato, the choice to transfer to a specific store in another city or lose her job.

Likewise, Lovato has put forth enough factual evidence to show that a similarly situated male employee was treated differently. I need not look further than Westenfeld for that comparable employee. He held the same position as Lovato, is a man, and was involved in the same "drama" as Lovato, but he was never asked to transfer to an inconvenient store under threat of termination. Nor did Walmart inquire about reducing his hours so that both he and Lovato could both work at the same store on different days. Westenfeld of course, didn't have the same night and weekend restrictions that Lovato had because of her childcare needs. That isn't a meaningless difference, but the standard is "similarly situated" employee, not "identically situated" employee. And as discussed above, Lovato did work nights and weekends for a while, which ceased not because she suddenly couldn't work those anymore, but because she says she felt unsafe and had to obtain an order of protection against Westenfeld. Furthermore, Preston's statement that Lovato was "full of drama" provides at least a colorable indication that Preston favored Westenfeld over Lovato. Perhaps it is coincidental, but recall that Westenfeld used similar language in his text messages to Lovato, stating she was "nothing but drama and everyone knows it." [DE 60-1 (Sealed) at 170.] It's not a smoking gun, but a jury may well draw that inference.

That's not to say I think Walmart has only offered clearly pretextual reasons or had no justification for how it approached the situation; these may be wholly legitimate

and a jury may see it that way too. *See Brummett*, 284 F.3d at 745 (affirming summary judgment and noting that employers are "under no obligation to bend over backwards to assist its employees with their job-related difficulties, especially difficulties caused by their own wrongdoing"). But Lovato has put forth sufficient evidence to create a jury issue.

Nothing in *Davis v. ESA Mgmt., LLC*, a case relied on by Walmart, commands a different result. *Davis v. ESA Mgmt., LLC*, 2018 WL 1706367, at *5 (N.D. Ill. Apr. 9, 2018). Here, unlike *Davis*, Walmart hasn't offered evidence of job *performance* related reasons as to why Lovato did not meet their expectations. As noted in *Davis*, "ESA has produced evidence that Davis did not meet her supervisors' expectations in at least the following ways: (1) by failing to clean hotel rooms according to both ESA and guest standards; (2) by consistently arriving late for work; (3) by taking longer than the allotted time to clean rooms; and (4) by propping a guest's door open, leaving the room unattended and exposed to theft." *Davis* is therefore far removed from this case.

In sum, given these contested questions of fact, this case very much in the mold of cases the Seventh Circuit has said are better "suited for trial, not summary judgment." *Haugerud*, 259 F.3d at 691 (quoting *Sweeney v. West,* 149 F.3d 550, 554 (7th Cir. 1998)).

### C. Lovato's Claim of Retaliation

Count III of Lovato's complaint alleges that Walmart retaliated against her because she engaged in protected activity. She says that she was retaliated against for reporting Westenfeld, obtaining the no contact letter and later the protective order based upon Westenfeld's alleged harassment. "Title VII also prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Id.*

But retaliation claims differ from standard discrimination claims when it comes to causation. Unlike status-based discrimination (based on sex, race, religion, color or national origin), claims of unlawful retaliation are premised on an employee's actions in response to employment discrimination. *Nassar*, 570 U.S. at 347–48. The Supreme Court has determined that this distinction matters for purposes of causation. "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360. The basic question as stated by the Seventh Circuit is "[d]oes the record contain sufficient evidence to permit a

reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord*, 839 F.3d at 563.

Walmart says that Lovato fails the but-for causation test because it had a legitimate reason to terminate Lovato based on her schedule and refusal to transfer to the store Preston offered. Like with the status-based claims, Walmart argues that Lovato cannot establish that she performed up to Walmart's legitimate expectations and that she cannot establish that she was treated less favorably than employees who did not engage in the protected activity.

Establishing a prima facie case requires Lovato to show similarly situated employees who received more favorable treatment and did not engage in the protected activity. For purposes of summary judgment, Walmart concedes Lovato engaged in protected activity. [DE 56 at 21.] Furthermore, drawing all inferences in favor of Lovato, she has put forth enough evidence to create a question of fact whether similarly situated employees who did not engage in the protected activity were treated more favorably. Again, I need not look further than Westenfeld. He did not engage in any protected activity, was similarly situated to Lovato as a current Purdue student and pharmacy intern, but he was not given an ultimatum of transferring to a store in another city and termination.

Walmart focuses heavily on the fact that no other employees were unable to work nights and weekends. This, it says, makes it impossible for Lovato to compare herself to any other similarly situated employee, including Westenfeld. But again, by

May 2015, Lovato had agreed to start working nights and weekends. She even agreed to

work with Westenfeld, but to her that quickly became unbearable given his alleged

conduct. Thus, this seems like an improper aspect to focus on, given that Lovato had

agreed to increase her availability and that as the school year approached, all the

pharmacy interns would be moving to part time to accommodate their school

schedules.

With that prima facie case plausibly made, Walmart has failed to carry its burden

that it had a legitimate and non-pretextual reason for terminating Lovato. That's

because Lovato testified unequivocally that Preston told her that the "reason I didn't

transfer you [to the store Lovato requested] is because nobody wants you, you're full of

drama." [Lovato Dep. 21:6-217:10.] If Lovato is telling the truth, then that sounds a lot

like retaliation. Walmart says this testimony is "self-serving" but does not dispute its

relevancy or admissibility. It would be error for me to reject Lovato's testimony on that

basis at summary judgment. *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("As we

have repeatedly emphasized over the past decade, the term 'self-serving' must not be

used to denigrate perfectly admissible evidence through which a party tries to present

its side of the story at summary judgment."). And as Preston conceded at her

deposition, there was no limit on the number of interns any specified store could have,

there was usually a variation in number between stores and "[e]very pharmacy

manager is always going to say they want another intern." [Preston Dep. 60:11-67:22.]

Lovato's and Preston's testimony raises at least a colorable claim that Walmart's supposed justifications for terminating Lovato's employment were pretextual.

Furthermore, Lovato has put forth evidence that her schedule was a non-issue (and arguably fully in line with Walmart policy for pharmacy interns) for a long stretch, and only became an issue after she first reported Westenfeld's harassment. As with the status-based discrimination claim, the jury may very well believe Walmart over Lovato, but Lovato has put forth evidence contradicting Walmart's version of events as to retaliation and creating issues of material fact. This claim must be decided by a jury.

### D. Lovato's State Law Retaliation Claim

The final count to address is Lovato's state law claim. To be frank, Lovato advances a very novel claim with this one. She casts this claim as based on *Frampton v. Cent. Ind. Gas. Co.,* in which the Indiana Supreme Court created a narrow public policy exception to the default employment at-will doctrine. Specifically, the Indiana Supreme Court held that an employee who "alleges he or she was retaliatorily discharged for filing a claim pursuant to the Indiana Workmen's Compensation Act or the Indiana Workmen's Occupational Diseases Act, has stated a claim upon which relief can be granted." *Frampton v. Cent. Ind. Gas. Co.,* 297 N.E.2d 425, 428 (Ind. 1973) (citations omitted). Lovato seeks to build upon this specific holding by seizing upon broader language in the opinion to suggest that the holding applies to any and all rights conferred by statute. *See Id.* ("[W]hen an employee is discharged solely for exercising a

statutorily conferred right an exception to the general rule must be recognized."). She says that because I.C. § 22-5-7-2(a) (which is decidedly not about Workmen's Comp) prohibits an employer from terminating an employee because the employee has sought a protective order, and because I.C. § 22-5-7-2(b)'s allows other changes to employment, such as location change, by mutual agreement, means that Lovato cannot be fired for refusing a transfer because she had sought and received a protective order. As is evident from this description, this is a pretty circular and confusing argument that unfortunately for Lovato and carries little legal weight.

As Walmart notes, taken to its logical conclusion, the claim Lovato is advancing would effectively immunize an employee from discharge and give them a full veto as to any change or proposed change in the conditions or terms of employment once the employee has sought an order of protection. That would be an absurd result and there is no indication that the state legislature intended this with I.C. § 22-5-7-2. Nor does the text of the statute support conferring such a broad power upon employees. Instead, subsection (b) appears to make explicit that in the event an employee does seek a protective order, an employee and their employer may still transfer the employee, if they both agree to the transfer.

This claim further runs afoul of the limited exceptions to at-will employment recognized by the Indiana Supreme Court. As mentioned, the issue before the Indiana Supreme Court in *Frampton* dealt only with retaliation claims based upon two specific

Indiana Workmen's statutes, not all statutes. And that same court has since rejected the broader reading of its opinion that Lovato now advocates. In *Meyers v. Meyers*, it said:

> At one point, the *Frampton* opinion comments that "when an employee is discharged solely for exercising a statutorily conferred right an exception to the general rule must be recognized." *Frampton*, 260 Ind. at 253, 297 N.E.2d at 428. The decisions during the intervening thirty years have made it plain that this language is intended to recognize quite a limited exception. Other than the *Frampton* exception, which is grounded on express statutory language, the Indiana appellate cases permitting retaliatory discharge actions have generally involved plaintiffs allegedly terminated in retaliation for refusing to violate a legal obligation that carried penal consequences. Most cases have refused to extend *Frampton*.

*Meyers v. Meyers*, 861 N.E.2d 704, 706–07 (Ind. 2007) (some internal citations omitted). In *Meyers*, the court rejected a plaintiff's claim to extend "the *Frampton* exception" to employment at-will to cover situations where an employee is retaliated against for complaining or asserting a claim for unpaid wages under statute. *Id.* at 706. Similarly, in *Montgomery v. Bd. of Trustees of Purdue Univ.*, 849 N.E.2d 1120, 1127 (Ind. 2006), that same court refused to extend *Frampton* to cover alleged retaliation for violations of the Indiana Age Discrimination Act, a statute which leaves enforcement of the statute to the Indiana Commissioner of Labor. And like the statute at issue in *Montgomery*, the statute Lovato seeks to avail herself of (I.C. § 22-5-7-2) does not create a private right of action. Even construing all facts in favor of her as the non-movant, Lovato has not put forth any evidence that Walmart fired her because she obtained a protective order against Westenfeld. Instead, she seeks to turn the fact Walmart says it fired her for refusing to

transfer to another store into a protected right because she had obtained a protective order. But as noted, such a proposition relies on a reading of I.C. § 22-5-7-2 which would be absurd. Walmart is entitled to summary judgment on this claim.

**Conclusion**

For the foregoing reasons, Walmart's Motion for Summary Judgment [DE 55] is GRANTED, in part, as to Counts I and IV, and DENIED, in part, as to Counts II and III; Walmart's motion to strike [DE 65] is DENIED; Lovato's Cross-Motion for Summary Judgment [DE 63] is DENIED; Walmart's Motions for Leave to file its briefs partially redacted and under seal [DE 54, 66] are GRANTED.

The Court will set a telephonic status conference with the parties in the coming weeks to discuss efforts to settle the case, select a trial date, as well as dates for the final pretrial conference and other trial-related deadlines.

SO ORDERED on July 10, 2019.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT